# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| **ROGER D. DUNHAM,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:09CV 53 SNLJ(LMB)** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Roger D. Dunham for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act. The cause was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of the Complaint. (Document Number 11). Defendant has filed a Brief in Support of the Answer. (Doc. No. 15).

## Procedural History

On March 30, 2006, plaintiff filed his application for benefits, claiming that he became unable to work due to his disabling condition on August 20, 2004. (Tr. 80-88). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated September 30, 2008. (Tr. 46-47, 50, 55, 5-

18).  Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council, which was denied on April 16, 2009.  (Tr. 20, 21-24).  Thus, the decision of the ALJ stands as the final decision of the Commissioner.  <u>See</u> 20 C.F.R. §§ 404.981, 416.1481.

## **Evidence Before the ALJ**

### A.    **ALJ Hearing**

Plaintiff's administrative hearing was held on August 6, 2008.  (Tr. 38).  Plaintiff was present and was represented by counsel.  (<u>Id.</u>).  The ALJ began the hearing by admitting a number of exhibits into the record.  (Tr. 21).

Plaintiff's attorney then examined plaintiff, who testified that he lived with his wife and his seventeen-year-old son.  (<u>Id.</u>).  Plaintiff stated that he was fifty-two years of age.  (Tr. 39).  Plaintiff testified that he completed the tenth grade and did not ever try to obtain a GED.  (<u>Id.</u>).  Plaintiff stated that the only vocational training he has received is forty hours training in heating and air conditioning about twenty years prior to the hearing.  (<u>Id.</u>).  Plaintiff testified that he was able to read and write.  (<u>Id.</u>).

Plaintiff stated that he was six feet tall and weighed 350 pounds or more.  (<u>Id.</u>).  Plaintiff testified that he had weighed this amount for about six years.  (<u>Id.</u>).

Plaintiff stated that he was not working at the time of the hearing and that he last worked in August of 2004.  (Tr. 40).  Plaintiff testified that at his last position, he worked part-time performing maintenance work at Country Hearth Inn.  (<u>Id.</u>).  Plaintiff stated that in the fifteen years prior to the hearing, he performed mostly labor positions.  (<u>Id.</u>).  Plaintiff testified that all of the positions he has had required lifting more than twenty pounds, carrying, standing, walking, bending, stooping, and digging.  (<u>Id.</u>).

Plaintiff testified that he is not able to work because he has arthritis in all of his joints, his shoulders are worn out, his knees are "gone," he has diabetes, he suffers from depression, he has high blood pressure, and he has cervical disc disease. (Tr. 40-41). Plaintiff stated that he sees a family doctor, Dr. Tim McPherson; Dr. Mulna Tamusku, who is at the same clinic as his family doctor; and Dr. Edmund Landry, a neurologist. (Tr. 41). Plaintiff testified that Dr. Landry told him that he needed back surgery due to pressure on his spine and nerve damage, but he was unable to find a surgeon to operate due to his size. (Id.).

Plaintiff stated that, at the time of the hearing, his pain was being treated with medication. (Id.). Plaintiff testified that he still experiences pain when he takes his medications. (Id.). Plaintiff stated that his pain increases with physical activity. (Id.). Plaintiff's attorney noted that plaintiff was carrying a cane with him at the hearing. (Tr. 42). Plaintiff testified that he uses the cane often, especially when he sits down and gets up. (Id.).

Plaintiff stated that he is only able to be on his feet for five minutes before he has to take a break. (Id.). Plaintiff testified that, after he is on his feet for five minutes, he experiences pain in his neck, back, knees, and shoulders. (Id.). Plaintiff stated that on bad days, he also experiences pain in his wrist or feet. (Id.). Plaintiff testified that he also has difficulty sitting for long periods. (Id.).

Plaintiff's attorney asked plaintiff whether he would be able to work at a job where he was required to lift fifteen to twenty pounds regularly, for a total of two to three hours during a workday. (Id.). Plaintiff testified that he would not be able to work at such a job. (Tr. 43). Plaintiff stated that if he worked a full day, he would be unable to come back the next day due to pain. (Id.).

Plaintiff testified that on a typical day, he gets out of bed, has a cup of coffee, and then sits on the couch. (Id.). Plaintiff stated that he does not perform any household chores or yard work. (Id.). Plaintiff testified that his son handles all of the chores. (Id.). Plaintiff stated that he only performs light activities around the house, such as helping his wife watch his grandchildren. (Id.).

Plaintiff testified that he experiences depression. (Id.). Plaintiff stated that he is scheduled to see a specialist for his depression. (Id.). Plaintiff testified that, at the time of the hearing, he was not under the care of a psychiatrist or counselor. (Tr. 44). Plaintiff stated that he had been taking medication for his depression for a while. (Id.). Plaintiff testified that his pain is the biggest factor that prevents him from working. (Id.). Plaintiff stated that if he makes a wrong move, he is "in trouble" for a few days. (Id.).

The ALJ indicated that he would review the file and make a decision. (Tr. 45).

## B.    Relevant Medical Records

The record reveals that plaintiff received treatment at Steele Family Rural Health Clinic from April 2002 through March 2009 for various impairments, including type II diabetes mellitus,[1] GERD,[2] obesity, shoulder pain, back pain, sleep disorder, left foot pain, and depression. (Tr. 372-474, 505-

---

[1]Diabetes mellitus is a chronic metabolic disorder in which the use of carbohydrate is impaired and that of lipid and protein is enhanced. It is caused by an absolute or relative deficiency of insulin and is characterized, in more severe cases, by chronic hyperglycemia, water and electrolyte loss, ketoacidosis, and coma. Stedman's Medical Dictionary, 529 (28th Ed. 2006). Type II diabetes is characterized by high blood glucose levels caused by either a lack of insulin or the body's inability to use insulin efficiently; it develops most often in middle-aged and older adults. Id. at 530.

[2]Gastroesophageal reflux disease (GERD) is a syndrome due to structural or functional incompetence of the lower esophageal sphincter, which permits retrograde flow of acidic gastric juice into the esophagus. See Stedman's at 556.

08, 566-77, 618-45, 685-96, 711-16).  Plaintiff was treated with medication.  (Id.).  Plaintiff was also

consistently advised to lose weight by adhering to an 1800 calorie diet.  (Id.).

On December 8, 2004, plaintiff presented to Theodore W. Duensing, D.O. with complaints

of acid reflux, nausea, and vomiting.  (Tr. 238).  Plaintiff reported a family history of colon cancer.

(Id.).  Dr. Duensing recommended a colonoscopy.  (Tr. 239).  Plaintiff underwent a colonoscopy on

December 16, 2004, which revealed multiple polyps[3] and diverticulosis.[4]  (Tr. 249).

On December 20, 2004, plaintiff underwent a barium enema due to complaints of abdominal

pain, which revealed diverticula.  (Tr. 224).

Plaintiff underwent a sleep study at Twin Rivers Regional Medical Center on March 1, 2005.

(Tr. 174).  Plaintiff was diagnosed with obstructive sleep apnea,[5] which improved with use of a

continuous positive airway pressure ("CPAP") machine.  (Tr. 175).  It was recommended that

plaintiff use the CPAP machine nightly, lose weight, and stop smoking.  (Id.).

Plaintiff underwent x-rays of the bilateral shoulders and cervical spine[6] on October 27, 2005,

---

[3]A general descriptive term used with reference to any mass of tissue that bulges or projects outward or upward from the normal surface level.  See Stedman's at 1537.

[4]Presence of a number of diverticula of the intestine, common in middle age.  A diverticulum is a pouch or sac opening from a tubular or saccular organ, such as the gut or bladder.  See Stedman's at 575.

[5]A disorder characterized by recurrent interruptions of breathing during sleep, due to temporary obstruction of the airway by lax, excessively bulky, or malformed pharyngeal tissues, with resultant hypoxemia and chronic lethargy.  See Stedman's at 119.

[6]The back is comprised of the cervical, thoracic and lumbar regions.  In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back.  There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae.  The sacrum lies directly below the fifth lumbar vertebra.  The coccyx, or tail bone, lies below the sacrum.  See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:27 (1993).

which revealed C6-C7 and C5-C6 ankylosis[7] with reduced joint space in the shoulder with osteoarthritis.[8] (Tr. 353).

Plaintiff underwent an MRI of the cervical spine on November 11, 2005, which revealed degenerative changes of the cervical spine with moderate narrowing of the central spinal canal at C4-C5 and moderate narrowing of the right neural foramen. (Tr. 190).

Plaintiff presented to Syed M. Nasir, M.D. for a pain management evaluation on March 29, 2006. (Tr. 188-89). Plaintiff's gait was stiff with a slight limp. (Tr. 188). Plaintiff had limited range of motion at both shoulders and the cervical spine due to pain. (Id.). Plaintiff had good range of motion of the lumbar spine with some pain. (Id.). Plaintiff's bilateral straight leg raise was negative. (Id.). There was no tenderness of the cervical spine, shoulder, or low back. (Id.). Plaintiff had full muscle strength of the bilateral upper and lower extremities. (Id.). Dr. Nasir's assessment was: chronic mechanical cervical back pain, degenerative arthritis, chronic bilateral shoulder and knee pain, chronic bilateral foot pain, chronic low back pain, hypertension, type 2 diabetes mellitus, sleep apnea on CPAP, depression and insomnia, obesity, and pending disability claim. (Id.). Dr. Nasir started plaintiff on Lyrica[9] and continued him on Ultram.[10] (Id.).

---

[7]Stiffening or fixation of a joint as the result of a disease process, with fibrous or bony union across the joint. Stedman's at 95.

[8]Arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result; mainly affects weight-bearing joints. Stedman's at 1388.

[9]Lyrica is indicated for neuropathic pain associated with diabetic neuropathy. See Physician's Desk Reference (PDR), 2527 (63rd Ed. 2009).

[10]Ultram is indicated for the management of moderate to moderately severe chronic pain in adults who require around-the-clock treatment of their pain for an extended period of time. See

Plaintiff saw Dr. Nasir for pain management on a monthly basis from May 2006 through October 2008, and diagnosed plaintiff with chronic mechanical cervical back pain, degenerative arthritis, chronic bilateral shoulder and knee pain, chronic bilateral foot pain, chronic low back pain, hypertension, type 2 diabetes mellitus, sleep apnea on CPAP, depression and insomnia, obesity, and myofascial pain syndrome.[11] (Tr. 525-26, 561-63, 579-606, 613-14, 665-66, 675-81). Dr. Nasir administered trigger point injections on May 8, 2006. (Tr. 616).

Plaintiff presented to Dr. Duensing on May 17, 2006, to schedule a colonoscopy. (Tr. 514). Plaintiff complained of blood in his stool. (Id.). Plaintiff's post-colonoscopy diagnoses were diverticulosis coli, history of colon polyps, and inadequate bowel preparation for removal of polyps. (Tr. 513).

Plaintiff underwent a barium enema on June 14, 2006, which revealed two possible polyps and multiple diverticula. (Tr. 520).

On July 17, 2006, Dr. Nasir continued the Ultram and prescribed Flexeril.[12] (Tr. 614).

Plaintiff presented to Edmund Landry, M.D. on August 24, 2006, with complaints of neck pain with radiation into the interscapular area of the upper back, pain in the elbows and wrists, pain in the lateral and buttock area around both hips, lower back pain, and right knee pain. (Tr. 668). Plaintiff also reported that his left hand goes to sleep while driving, his great toe has been numb for

PDR at 2429.

[11]Irritation of the muscles and fascia of the back and neck causing acute and chronic pain not associated with any neurologic or bony evidence of disease; presumed to arise primarily from poorly understood changes in the muscle and fascia themselves. Stedman's at 1907.

[12]Flexeril is a skeletal muscle relaxant which relieves muscle spasm of local origin without interfering with muscle function. See PDR at 966.

years, and his right second toe is slightly numb.  (Id.).  Plaintiff indicated that he was no longer able to reach far enough to comb his hair or shave.  (Id.).  A physical examination of plaintiff's neck revealed 40 degrees flexion, 0 degrees extension, 40 degrees rotation to the right and 50 degrees rotation to the left, all accompanied by complaints of pain.  (Id.).  Tenderness was noted at the left paravertebral muscles.  (Id.).  An examination of plaintiff's back revealed no tenderness, 60 degrees flexion, and negative straight leg raising bilaterally.  (Id.).  Elevation of plaintiff's shoulders was limited to 90 degrees with complaints of pain.  (Id.).  Plaintiff's left knee was non tender, with no swelling, and slight medial laxity.  (Id.).  Plaintiff had decreased sensation at the right first and second toes.  (Id.).  Dr. Landry noted that an MRI of the cervical spine from November 2005 revealed moderate narrowing of the cervical spinal canal at C4, C5.  (Tr. 669).  Dr. Landry's impression was cervical degenerative disc disease,[13] cervical spinal stenosis,[14] bilateral rotator cuff disease, lower back pain, possible torn meniscus at the left knee, and Dupuytren's disease[15] in the hands and feet.  (Id.).  Dr. Landry recommended a neurosurgical evaluation.  He noted that he had been unable to find a neurosurgeon that would accept Medicaid after faxing plaintiff's "significant findings."  (Id.).

On August 29, 2006, Dr. Nasir discontinued the Flexeril, continued the Ultram, and started

---

[13]A general term for both acute and chronic processes destroying the normal structure and function of the intervertebral discs.  See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:201 (1993).

[14]Narrowing of the spinal canal.  See Stedman's at 1832.

[15]A condition characterized by multiple fibromas, with relatively widespread distribution.  See Stedman's at 725.  A fibroma is a benign neoplasm derived from fibrous connective tissue.  Id. at 724.

plaintiff on Hydrocodone.[16]   (Tr. 612).   On September 28, 2006, plaintiff reported that the Hydrocodone did not last long enough and caused itching on his face. (Tr. 609). Dr. Nasir noted that plaintiff was unable to find a local neurosurgeon but was willing to go to St. Louis. (Id.). Dr. Nasir discontinued the Hydrocodone and started plaintiff on Methadone.[17] (Tr. 610). On October 27, 2006, plaintiff reported that his pain was better after starting Methadone and that he had no side effects. (Tr. 607). Dr. Nasir continued the Methadone and Ultram. (Id.). On November 28, 2006, plaintiff reported that his pain was stable on his current medications. (Tr. 605). Dr. Nasir noted that Dr. Kenneth Smith, a neurosurgeon in St. Louis, did not believe plaintiff was a candidate for a neurosurgery consultation. (Id.). Plaintiff was continued on Methadone and Ultram. (Tr. 606). Plaintiff reported that his pain was stable on his medications on December 28, 2006. (Tr. 603). On January 25, 2007, plaintiff reported experiencing more pain than usual and felt that the Methadone was not lasting long enough. (Tr. 601). Dr. Nasir increased plaintiff's dosage of Methadone. (Tr. 602). On February 28, 2007, plaintiff reported that his pain was better after the Methadone dosage was increased. (Tr. 599). On March 30, 2007 and April 30, 2007, plaintiff reported that his pain was stable. (Tr. 597, 595). On May 30, 2007, plaintiff reported that his pain was under control most of the time but physical activity increased his pain. (Tr. 593). On June 29, 2007, plaintiff reported that the Methadone was not as effective as it previously had been. (Tr. 591). Dr. Nasir continued plaintiff on his medication regimen. (Id.). On July 25, 2007, plaintiff continued to complain that the Methadone was not as effective as it had previously been. (Tr. 589). Dr. Nasir increased plaintiff's

---

[16]Hydrocodone is an opioid analgesic indicated for the relief of moderate to moderately severe pain.  See PDR at 3144-45.

[17]Methadone is an opioid analgesic indicated for the relief of moderate to severe pain and as part of drug addiction detoxification and maintenance programs.  See PDR at 3289

dosage of Methadone. (Id.). On August 23, 2007, plaintiff reported that his pain was much better since the Methadone had been increased and that he was able to do more physical activities with less pain. (Tr. 587). On September 26, 2007, October 17, 2007, November 28, 2007, January 28, 2008, March 19, 2008, April 25, 2008, May 28, 2008, and June 25, 2008 plaintiff reported that his pain was stable. (Tr. 585, 583, 581, 579, 665, 681, 680, 679).

Plaintiff presented to Esteban Gambaro, M.D. on March 5, 2008 for a consultation regarding a repeat colonoscopy. (Tr. 663). Plaintiff underwent a colonoscopy on March 31, 2008, which revealed diverticulosis and a small polyp. (Tr. 647). Dr. Gambaro was unable to complete the colonoscopy due to poor bowel preparation. (Id.).

Plaintiff underwent x-rays of the knees on March 28, 2008, which revealed slight narrowing of the medial and lateral joint space of the left knee and the medial joint space of the right knee, without significant osteophyte formation or fracture. (Tr. 682).

On July 25, 2008, plaintiff reported to Dr. Nasir that he was having more pain since lifting his granddaughter the previous day but otherwise was doing well on his medication regimen. (Tr. 678). On August 25, 2008, plaintiff reported that his pain was stable. (Tr. 677). On September 24, 2008, plaintiff reported experiencing more pain than usual due to lifting tree limbs from his yard the previous day. (Tr. 676). On October 21, 2008, plaintiff reported some foot pain but indicated that his medications were still helping his pain most of the time. (Tr. 675). Dr. Nasir indicated that the pain clinic would be closing the next month and that plaintiff should contact his primary care physician for continuation of his Methadone. (Id.).

Plaintiff presented to Doug Foltz, DPM, on November 6, 2008, for a diabetic foot evaluation. (Tr. 702). Plaintiff complained of numbness in his right great toe and semi-painful masses along the

plantar aspects of his feet. (Id.). Dr. Foltz's assessment was Ledderhoses disease (multiple plantar fibromatosis) of the foot, and neuropathy[18] of the right great toe. (Id.). Dr. Foltz indicated that the probable cause of plaintiff's neuropathy was his diabetes, although no treatment was warranted at that time because it was not progressive. (Id.). Dr. Foltz recommended daily foot inspections and encouraged follow-up as needed. (Id.).

The record reveals that plaintiff saw a psychiatrist[19] for depression on December 5, 2008, January 5, 2009, February 5, 2009, and March 10, 2009. (Tr. 705-08). Plaintiff was prescribed Wellbutrin,[20] Risperdal,[21] Abilify,[22] Trazodone,[23] and Geodon.[24] (Tr. 707-08).

Plaintiff saw Dr. Landry on February 3, 2009, with complaints of bilateral knee pain. (Tr. 726-27). Dr. Landry noted that plaintiff walked with a limp, without an assistive device. (Id.). An examination of the knees revealed no joint effusion or skin rash. (Id.). Plaintiff's mood and affect were described as normal. (Id.). Dr. Landry diagnosed plaintiff with osteoarthritis of the knees. (Tr.

---

[18]A classic term for any disorder affecting any segment of the nervous system. Stedman's at 1313.

[19]The signature of the psychiatrist is illegible.

[20]Wellbutrin is indicated for the treatment of major depressive disorder. See PDR at 1649.

[21]Risperdal is a psychotropic drug indicated for the treatment of schizophrenia. See PDR at 1754.

[22]Abilify is an antipsychotic drug indicated for the treatment of schizophrenia, bipolar disorder, and major depressive disorder. See PDR at 881.

[23]Trazodone is an antidepressant indicated for the treatment of depression and anxiety disorders. See PDR at 3296.

[24]Geodon is an antipsychotic drug indicated for the treatment of schizophrenia and bipolar mania. See PDR at 2521.

727). He administered the first of three Synvisc injections. (Id.).

**The ALJ's Determination**

The ALJ made the following findings:

1.    The claimant met the insured status requirements of the Social Security Act through September 30, 2006.

2.    The claimant has not engaged in substantial gainful activity since August 20, 2004, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: morbid obesity, degenerative disc disease with degenerative joint disease (osteoarthritis) of the cervical spine, and obstructive sleep apnea (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b).

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on June 21, 1956 and was forty-eight years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963). On June 29, 2006, the claimant changed categories and became closely approaching advanced age.

8.    The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not an issue in this case because the claimants's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

- 12 -

11.     The claimant has not been under a disability, as defined in the Social Security Act, from August 20, 2004 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 10-18).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits filed on March 30, 2006, the claimant is not disabled under sections 216(I) and 223(d) of the Social Security Act.

Based on the application for supplemental security income protectively filed on March 29, 2006, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 18).

## Discussion

### A.     Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)). "[T]he court

must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

**B.    The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c)), 416.920 (c)). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial

gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience.  See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

**C.**     **Plaintiff's Claims**

Plaintiff first argues that the ALJ erred in applying the Medical-Vocational Guidelines at step five of the sequential evaluation.  Plaintiff also contends that the ALJ erred in determining plaintiff's residual functional capacity.  Plaintiff finally argues that the ALJ erred in assessing the credibility of plaintiff's subjective complaints of pain and limitations.  The undersigned will discuss plaintiff's claims in turn, beginning with the ALJ's credibility assessment.

1.    **Credibility Assessment**

Plaintiff argues that the ALJ erroneously found plaintiff's subjective complaints of pain and limitation not credible.  Defendant contends that the ALJ's credibility determination is supported by substantial evidence on the record as a whole.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced."  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints).  Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors."  Kelley, 133 F.3d at 588.  Polaski requires the consideration of:  (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions.  Polaski, 739 F.2d at 1322.

The undersigned finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole.  "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully credible when []he claims that [the pain] hurts so much that it prevents h[im] from engaging in h[is] prior work."  Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987).  Thus, the relevant

- 16 -

inquiry is whether or not plaintiff's complaints of pain to a degree of severity to prevent him from working are credible.

In his opinion, the ALJ properly pointed out Polaski factors and other inconsistencies in the record that detract from plaintiff's complaints of disabling pain. (Tr. 13-16). The ALJ first found that the objective medical evidence is not supportive of plaintiff's allegations of disability. (Tr. 13). Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003). The ALJ stated that while imaging studies confirm plaintiff's neck pain and Dr. Nasir has identified plaintiff's neck pain as degenerative arthritis and mechanical pain, Dr. Nasir has identified plaintiff's shoulder, knee, and low back conditions as merely chronic pain. (Tr. 14). The ALJ also pointed out that Dr. Nasir has found that plaintiff's muscle strength and passive range of motion were normal and that plaintiff had good range of motion in his lumbar spine. (Tr. 15, 188). There was no tenderness in plaintiff's cervical spine, shoulder, or low back. (Id.). The ALJ further noted that plaintiff's gait and balance were consistently normal from April 2007 through November 2008. (Tr. 16).

The ALJ next discussed plaintiff's testimony that he cannot stand and walk more than five minutes due to pain. The ALJ stated that there is nothing in the medical record supporting this allegation. (Tr. 13). The ALJ pointed out that none of plaintiff's physicians have imposed such functional restrictions. (Id.). "The lack of physical restrictions militates against a finding of total disability." Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999) (citing Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993)). The ALJ also noted that, although plaintiff used a cane at the

administrative hearing, no physician prescribed a cane. (Tr. 13). In fact, as recently as February 2009, Dr. Landry stated that plaintiff did not use an assistive device for ambulation. (Tr. 719).

The ALJ next stated that plaintiff's poor earnings records do not indicate that he is motivated to work, having only one year of earnings above the minimum wage since 1995. (Tr. 16). Although not controlling on the issue of plaintiff's complaints of disabling pain, a claimant's work history is a proper factor in assessing credibility. See Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996).

The ALJ discussed plaintiff's medications. The ALJ stated that plaintiff's impairments were controlled with medication. (Tr. 16). Plaintiff consistently reported to Dr. Nasir that his pain was stable while taking Methadone and Ultram. Evidence of effective medication resulting in relief may diminish the credibility of a claimant's complaints. See Rose v. Apfel, 181 F.3d 943, 944 (8th Cir. 1999). Plaintiff also reported no side effects from his medications. The absence of side effects from medication is a proper factor to be considered in evaluating subjective complaints of pain. See McKinney v, Apfel, 228 F.3d 860, 864 (8th Cir. 2000).

Finally, the ALJ pointed out that plaintiff has been noncompliant with treatment. (Tr. 15). Specifically, the ALJ noted that plaintiff did not lose weight despite being advised to adhere to an 1800 calorie diet to control his weight and diabetes. (Id.). Failure to follow a prescribed course of treatment may detract from a claimant's credibility. See O'Donnell v. Barnhart, 318 F.3d 811, 819 (8th Cir. 2003).

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives

good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient and his finding that plaintiff's complaints are not entirely credible is supported by substantial evidence. Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

## 2.     Residual Functional Capacity

Plaintiff argues that the ALJ erred in formulating his residual functional capacity. Specifically, plaintiff contends that the ALJ's determination that plaintiff is capable of performing the full range of light work lacks any medical support.

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 704.

The ALJ concluded that plaintiff was capable of performing the full range of light work.

(Tr. 13). The ALJ stated that his determination was supported by "lack of evidence aside from the limitations to the claimant's cervical spine and reported shoulder problems." (Tr. 16). The ALJ indicated that great weight was given to the assessment of Kenneth Smith, M.D., that plaintiff was not a neurosurgical candidate. (Id.). The ALJ further stated that great weight was given to Dr. Nasir and Dr. McPherson as well as the other medical personnel at Steele Family Clinic. (Id.).

The undersigned finds that the ALJ's residual functional capacity determination is not supported by substantial evidence. The ALJ indicated that his assessment was supported by the lack of evidence aside from limitations to plaintiff's cervical spine and shoulder problems. No physician, however, ever expressed an opinion on plaintiff's functional limitations due to his cervical spine or shoulder impairments. Although the ALJ suggests that the medical evidence of plaintiff's impairments was minimal, Dr. Landry diagnosed plaintiff with cervical degenerative disc disease, cervical spinal stenosis, bilateral rotator cuff disease, lower back pain, possible torn meniscus at the left knee, and Dupuytren's disease in the hands and feet. (Tr. 669). Upon physical examination, Dr. Landry noted some limitation of motion of the neck, shoulders, and back. (Tr. 668). Dr. Landry recommended a neurological evaluation based on his "significant findings." (Tr. 669). Based on Dr. Landry's findings alone, it is questionable whether plaintiff would be capable of performing the full range of light work.

The ALJ also indicated that great weight was given to the assessment of Dr. Kenneth Smith, that plaintiff was not a neurosurgical candidate. (Tr. 16). The record, however, contains no treatment notes from Dr. Smith. The only reference to Dr. Smith in the record is contained in a November 28, 2006 treatment note of Dr. Nasir. (Tr. 605). Dr. Nasir noted that "Dr. Kenneth

- 20 -

Smith, a neurosurgeon in St. Louis, does not feel that the patient is a candidate for neurosurgery consultation." (Id.). This notation suggests that Dr. Smith never saw plaintiff but either spoke to Dr. Nasir about plaintiff or reviewed plaintiff's medical records. Dr. Nasir does not indicate why Dr. Smith believed that plaintiff was not a neurosurgical candidate. As such, the ALJ erred in assigning "great weight" to "the assessment of Dr. Kenneth Smith." (Tr. 16).

The ALJ also indicated that he was assigning great weight to the opinion of Dr. Nasir, as well as the other medical personnel at Steele Family Clinic. (Id.). However, neither Dr. Nasir nor any medical personnel at Steele Family Clinic ever expressed any opinion regarding plaintiff's functional restrictions. Plaintiff saw Dr. Nasir for pain management on approximately a monthly basis from May 2006 through October 2008. Dr. Nasir diagnosed plaintiff with chronic mechanical cervical back pain, degenerative arthritis, chronic bilateral shoulder and knee pain, chronic bilateral foot pain, chronic low back pain, hypertension, type 2 diabetes mellitus, sleep apnea, depression and insomnia, obesity, and myofascial pain syndrome. (Tr. 525-26, 561-63, 579-606, 613-14, 665-66, 675-81). Dr. Nasir consistently prescribed narcotic drugs for plaintiff's pain, including Hydrocodone and Methadone. Dr. Nasir's records do not support the ALJ's determination that plaintiff is capable of performing the full range of light work.

There is no opinion from any physician, treating or consulting, regarding plaintiff's ability to function in the workplace with his combination of impairments. As such, there is no medical evidence in the record suggesting that plaintiff can, or cannot, perform light work. The residual functional capacity must be based on some medical evidence; if there is no such evidence, the residual functional capacity "cannot be said to be supported by substantial evidence." Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995).

An ALJ has a duty to obtain medical evidence that addresses the claimant's ability to function in the workplace. See Hutsell, 259 F.3d at 711-712; Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000). Here, the ALJ's physical residual functional capacity assessment fails Lauer's test that the residual functional capacity be supported by *some* medical evidence. See Lauer, 245 F.3d at 703.

Accordingly, the undersigned recommends that this matter be reversed and remanded to the ALJ in order for the ALJ to order additional medical information addressing plaintiff's ability to function in the workplace and formulate a new residual functional capacity for plaintiff based on the medical evidence in the record.

## 3. Medical-Vocational Guidelines

Plaintiff argues that the ALJ erred in applying the Medical-Vocational Guidelines at step five of the sequential evaluation because plaintiff has significant non-exertional impairments, including pain, obesity, and depression. Defendant contends that because the ALJ determined that plaintiff's impairments did not result in limitations unrelated to the strength demands of work and he maintained the residual functional capacity for the full range of light work, utilizing the Medical-Vocational Guidelines was proper.

As set forth above, once a claimant establishes that he or she is unable to return to past relevant work, the final step in the sequential process requires a determination of whether a claimant can perform other work in the national economy. "If an applicant's impairments are exertional, (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the Medical-Vocational Guidelines or 'Grids,' which are fact-based generalization[s] about the availability of jobs for people of varying ages, educational

backgrounds, and previous work experience, with differing degrees of exertional impairment."

Gray v. Apfel, 192 F.3d 799, 802 (8th Cir. 1999) (quotation omitted). Use of the guidelines is

permissible only if the claimant's characteristics match those contained in grids and only if the

claimant does not have non-exertional impairments. See Foreman v. Callahan, 122 F.3d 24, 25

(8th Cir. 1997).

As explained by the Eighth Circuit, "[t]he grids [] do not accurately reflect the availability

of jobs to people whose impairments are non-exertional, and who therefore cannot perform the

full range of work contemplated within each table." Id. at 26. Accordingly, the Eighth Circuit

requires "the Commissioner [to] meet his burden of proving that jobs are available for a

significantly nonexertionally impaired applicant by adducing the testimony of a vocational expert."

Id. "[W]here a claimant suffers from a non-exertional impairment which substantially limits his

ability to perform gainful activity, the grid cannot take the place of expert vocational testimony."

Id. (quoting Talbott v. Bowen, 821 F.2d 511, 515 (8th Cir. 1987)).

As discussed above, the ALJ formulated a residual functional capacity that was not

supported by substantial evidence. Based on this erroneous residual functional capacity, he then

applied the Medical-Vocational Guidelines and determined that plaintiff could perform other work

existing in significant numbers in the national economy. As a result, the undersigned recommends

that the decision of the Commissioner be reversed and this matter be remanded to the ALJ in

order for the ALJ to reassess plaintiff's residual functional capacity and, if necessary, to adduce

the testimony of a vocational expert to determine how plaintiff's non-exertional impairments

restrict his ability to perform jobs in the national economy.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that, pursuant to sentence four of 42 U.S.C.

§ 405 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the

Commissioner for further proceedings consistent with this Report and Recommendation.


The parties are advised that they have fourteen (14) days in which to file written

objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an

extension of time for good cause is obtained, and that failure to file timely objections may result in

a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir.

1990).


Dated this ___6th___ day of May, 2010.

Lewis M. Blanton

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE